### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

```
L.T., individually            :  Civil Action No. 04-1381(NLH)
and on behalf of his son,     :
B.T.,                         :
                              :
        Plaintiffs,           :
                              :  Fed. R. Civ. P. 52(a)(1)
                              :
     v.                       :  OPINION
                              :
THE MANSFIELD TOWNSHIP        :
SCHOOL DISTRICT,              :
                              :
        Defendant.            :
                              :
```

**APPEARANCES:**

Gregory Guy Johnson, Esquire
282 Glenn Avenue
Lawrenceville, NJ 08648

 *Attorney for Plaintiffs*

James F. Schwerin, Esquire
Parker McCay, PA
Building Four East
1009 Lenox Drive
Suite 102A
Lawrenceville, NJ 08648

 *Attorney for Defendant*

**HILLMAN**, District Judge

## I.    INTRODUCTION

A five-day bench trial was held in this case involving

Plaintiffs' claims arising under the Individuals with

Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. and

the Rehabilitation Act of 1973, 29 U.S.C. § 504(a).[1]  The Court

issues this Opinion in accordance with Federal Rule of Civil

Procedure 52(a)(1).[2]

Plaintiffs, parents of a disabled elementary school student,

brought suit against Defendant Mansfield Township School District

claiming that the district failed to provide a free appropriate

public education to their son when he was out of school for

seventeen days in September 2003, and when it did not provide a

proper extended year program or transportation services.[3]  For

the reasons expressed below, the Court renders a judgment in

Plaintiffs' favor with regard to the seventeen days of missed

schooling, and judgment in favor of the district on the other two

claims.  As also explained below, Plaintiffs' damage award shall

constitute compensatory education and attorney's fees and costs,

---

[1]This Court has jurisdiction to hear this case pursuant to
28 U.S.C. § 1331.

[2]This Opinion constitutes the Court's Findings of Fact and
Conclusions of Law pursuant to Rule 52(a).  Pierre v. Hess Oil
Virgin Islands Corp., 624 F.2d 445, 450 (3d Cir. 1980) (holding
that to be in compliance with Rule 52(a), findings of fact and
conclusions of law do not need to be stated separately in a
court's memorandum opinion); see also Wedgewood Village Pharmacy,
Inc. v. Ashcroft, 293 F. Supp. 2d 462, 466 (D.N.J. 2003) (issuing
an opinion which constituted the courts findings of fact and
conclusions of law).

[3]Prior to the bench trial, the matter involved numerous
motions, several oral arguments, one written opinion and one oral
opinion, which resulted in the dismissal of all of Plaintiffs'
claims, including those arising under 42 U.S.C. § 1983, except
for three issues arising under the IDEA and Rehabilitation Act.

2

but not monetary damages.

## II.  DISCUSSION

The facts in this case are mostly uncontested.  Following is the recitation of the uncontested background facts set forth in the Court's previous Opinion.  Findings of fact from trial will be contained in the Court's analysis of Plaintiffs' claims.

### A.  *Background Facts*

B.T. is disabled with Asberger's syndrome, bipolar disorder, ADHD, sensory integration dysfunction, central auditory processing difficulties, and dysgraphia.  Prior to moving to Mansfield Township, B.T. had been classified as eligible for IDEA services, and his previous school district had sent B.T. to the Yale Academy, a private institution.  When B.T. moved to Mansfield, the Mansfield Township Board of Education continued the placement at Yale for the first year he was in Mansfield, which was third grade.

For the following school year, 2002-03, B.T.'s parents no longer wanted B.T. to attend Yale.  Instead of Yale, B.T.'s parents wanted B.T. to attend the Access School ("Access"), another private institution.  The school district did not believe that Access was appropriate for B.T.  The parents filed a due process petition seeking to have B.T. go to Access.  That matter was settled, and the parents and the school district agreed that B.T. would attend Access for 2002-03, and that the parents would

3

assume all responsibility for transportation for as long as B.T. attended Access.  The parents were paid $3,000 for all expenses. The Board provided a program for B.T. in the summer of 2003, but transportation was not provided.

In early September of 2003, the parents sought to have B.T. return to the Board's own schools.  As this was not done until after the start of the school year, and there was no program in place for B.T. in-district, it was proposed to the parents that he be temporarily placed on home instruction pending the hiring of a teacher solely to help educate B.T.  Because the parents did not agree, the delay resulted in the teacher in question finding employment elsewhere.  Home instruction was offered and rejected, and B.T. returned to Access for that year.  B.T., however, had missed seventeen days of school prior to returning to Access.

B.T.'s parents filed another due process petition, which was also settled.  This settlement provided that the Board would transport B.T. to Access for 2003-04 by mini-van/bus at the Board's expense, that his June 2003 IEP remained in effect, and that an extended year program would be discussed in January 2004. In the summer of 2004, the Board provided B.T. with an extended year program.  Transportation was not provided.  Thereafter, B.T. was no longer the responsibility of the Board because due to his increasing grade level, the Northern Burlington Regional School District became the local educational agency responsible for

4

educating B.T.[4]

**B.    *Analysis***

Three issues were presented for resolution at trial: (1)
Plaintiffs' claim that the Board violated the IDEA by not
providing a proper extended year program (ESY program) during the
summer of 2003 to meet B.T.'s needs in speech and occupational
therapy,[5] and (2) by not providing transportation services to
that summer program.[6]  Plaintiffs also claim (3) that the Board

---

[4]B.T. and his family now reside in Tennessee.

[5]Plaintiffs' Amended Complaint states a claim that Defendant
did not provide a proper summer program for the summers of 2001
and 2002 as well.  Plaintiffs have abandoned that claim.

[6]Although not set forth as a separate count in their
complaint, Plaintiffs appear to have also asserted a claim that
Defendant violated the IDEA because the June 2003 IEP required an
assistive technology evaluation, and Defendant failed to provide
one.  (Amend. Compl. ¶ 8.)   A review of the June 2003 IEP,
however, shows that with regard to assistive technology, the IEP
lists "none needed."   Plaintiffs argue that this violates the
IDEA because Dr. Barenbaum, Plaintiffs' expert, recommended that
B.T. receive an assistive technology evaluation in her November
2002 report, which Plaintiffs claim was to be incorporated into
the June 2003 IEP.
    The Court finds that Defendant's failure to provide an
assistive technology evaluation was not a violation of the IDEA
because the IEP did not call for an evaluation.  See 34 C.F.R. §
300.105 ("On a case-by-case basis, the use of school-purchased
assistive technology devices in a child's home or in other
settings is required if the child's IEP Team determines that the
child needs access to those devices in order to receive FAPE.").
Further, Defendant's failure to include the recommendation for a
technical assistance evaluation in the IEP is not a violation of
the IDEA, because Plaintiffs have not proven that Defendant is
required to accept all the recommendations of a parent's
independent evaluator.  See 34 C.F.R. § 300.502(c) (stating that
the IEP must consider the independent evaluation as part of the
development of the IEP, but not stating that the independent

5

violated the Rehabilitation Act and the IDEA by not providing a free appropriate public education (FAPE) for the seventeen days during September 2003.[7]

> **1.    Whether Defendant's failure to provide B.T. with an ESY program and transportation violated his right to a FAPE under the IDEA**

Plaintiffs allege that Defendant violated the IDEA by not providing as a part of B.T.'s IEP a proper extended school year program (ESY program) during the summer of 2003 to meet B.T.'s needs in speech and occupational therapy, and by not providing transportation services.  The Third Circuit has explained the purpose of the IDEA:

> The IDEA implements the congressional determination that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1).  To that end, the statute requires, in relevant part, that states receiving federal funding under the statute must have "in effect policies and procedures to ensure that ... [a] free appropriate public education is available to all

---

evaluation must be wholly incorporated into the IEP);  34 C.F.R. § 300.321 (development of IEP is a team concept).  Further, the Court notes that in June 2003 the district completed a form requesting an assistive technology evaluation for B.T., although the Burlington County Special Services School District never received the form.  Additionally, testimony at trial established that B.T. had already been provided an AlphaSmart, an assistive technology device, at Access that was paid for by the district.

[7]Plaintiffs' Amended Complaint delineates that the seventeen-days-without-school claim violates the IDEA and the Rehabilitation Act, while the other two claims only violate the IDEA.

6

children with disabilities...." 20 U.S.C. §
1412(a)(1)(A). "An individualized education program, or
an individualized family service plan ... [must be]
developed, reviewed and revised for each child with a
disability...." 20 U.S.C. § 1412(a)(4). The education
of disabled students must "[t]o the maximum extent
appropriate" be provided "with children who are not
disabled." 20 U.S.C. § 1412(a)(5)(A) ("[S]pecial
classes, separate schooling, or other removal of
children with disabilities from the regular educational
environment occurs only when the nature or severity of
the disability of a child is such that education in
regular classes with the use of supplementary aids and
services cannot be achieved satisfactorily.").

L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389-90 (3d Cir. 2006).

When a school district challenges an IEP, the burden of

persuasion lies with it, but when parents challenge the IEP, the

burden of persuasion lies with them.  Andrew M. v. Delaware

County Office of Mental Health and Mental Retardation, 490 F.3d

337, 345 (3d Cir. 2007).

The Court finds that Plaintiffs have not met their burden of

persuasion to show that Defendant's failure to provide B.T. with

an adequate ESY program for 2003, or provide transportation to

the ESY program, was in violation of the IDEA.  It is uncontested

that B.T.'s June 2003 IEP did not mention a summer program or

transportation to that summer program.  Plaintiffs presented

evidence at trial--namely, the testimony of their expert witness

Dr. Edna Barenbaum, who reviewed the June 2003 IEP in a report

prepared in July 2006--that the IEP did not meet B.T.'s needs

because it did not provide a measurement or list a grade level,

7

and because there were no goals and objectives as required by the IDEA. Dr. Barenbaum also testified that the school district was aware that without a summer program, B.T. would regress. Plaintiffs, however, presented no other evidence to prove why B.T. was entitled to an ESY program. See 34 C.F.R. § 300.106(a)(2) ("Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.).[8]  Further,

_____

[8]The IDEA itself does not discuss ESY programs.  Several courts have analyzed when ESY programs are required, and what the nature of those programs should be.  See, e.g., MM v. School District of Greenville County, 303 F.3d 523, 538 (4th Cir. 2002) (stating that "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months," but that "the mere fact of likely regression is not a sufficient basis, because all students, disabled or not, may regress to some extent during lengthy breaks from school"); Reusch v. Fountain, 872 F. Supp. 1421 (D. Md. 1994)(listing six factors that the IEP team should consider in deciding if the child is eligible for ESY as a related service: 1. Regression and recoupment; 2. Degree of progress toward IEP goals and objectives; 3. Emerging skills/breakthrough opportunities; 4. Interfering Behavior; 5. Nature and/or severity of disability; 6. Special circumstances that interfere with child's ability to benefit from special education.).  Further, the Regulations provided by the Office of Special Education and Rehabilitative Services, Department of Education, state that "individualized determinations about each disabled child's need for ESY services are made through the IEP process."  Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 FR 46540, 46582.  Plaintiffs here have failed to present sufficient evidence to address these, or other, requirements in determining the appropriateness of an ESY program.

Plaintiffs did not offer any other evidence to prove what would have been an appropriate ESY program.[9]  If the June 2003 IEP set forth that B.T. was required to have an ESY program, and it set forth the parameters of the ESY program, and Plaintiffs demonstrated that the school failed to abide by those terms, Plaintiffs would have a valid IDEA claim.  However, without proving whether B.T. was entitled to an ESY program, and what an adequate ESY program would have been, Plaintiffs have failed to prove that Defendant violated the IDEA for the summer program B.T. was provided.[10]

_____

[9]Plaintiffs' expert testified generally as to what type of instruction would have been ideal for B.T.'s summer program, but Plaintiffs do not present a specific summer program to compare to the program provided by the district in order to definitely determine the deficiencies.  B.T.'s mother testified that she felt that B.T. should have received speech therapy, occupational therapy, social skills and counseling for the 2003 ESY program.  Even though a parent is part of the IEP team, and the IDEA requires school districts to develop an IEP for each child with a disability with parents playing "a significant role" in this process, Schaffer v. Weast, 546 U.S. 49, 53 (2005), Plaintiffs have not proven that a parent's wishes are the only consideration in creating an IEP, see 34 C.F.R. § 300.321 (development of IEP is a team concept).

[10]In the summer of 2003, B.T. received reading and language arts and math instruction.  He also received one-on-one instruction in adaptive physical education.  At trial, Plaintiffs presented evidence that on one occasion, the school called B.T.'s mother to find where B.T. was, because his schedule was always changing and they could not find him.  Further, Plaintiffs presented testimony from their parent advocate, Lorraine Saari, that she requested a summer program, and that the program Defendant provided did not meet B.T.'s needs.  The Court acknowledges that the summer program was not what the parents or their advocate wished for B.T.; however, the Court also acknowledges that Plaintiffs provided no evidence that Defendant

Correspondingly, Plaintiffs have not set forth how Defendant's failure to provide transportation violated the IDEA. Plaintiffs state that the "law is clear that transportation (and developmental services such as physical therapy and occupational services) are the District's obligation at no cost to the parents of disabled children pursuant to the IDEA, 20 U.S.C. § 1401 and NJAC 6A:14-3.9." Section 1401 of the IDEA is the "Definitions" provision, and it contains 36 subparts. Plaintiffs do not specify which subpart applies to transportation. Upon the Court's review of the provision, it appears that Plaintiffs must be referring to subpart 26, which defines "Related services."

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C.A. § 1401(26)(A). The plain language of this provision does not mean that a school district is required to provide

was required to provide B.T. with any summer program at all.

transportation under any and all circumstances.  Rather, this provision states that related services, such as transportation, "may be" required.  The state version of § 1401(26)(A), cited by Plaintiffs, is also not mandatory.  See N.J.A.C. 6A:14-3.9 (citing N.J.A.C. 6A:27-5.1(a), "Students with special needs shall be provided with transportation in accordance with N.J.S.A. 18A:39-1 et seq. and in accordance with their Individualized Education Program (IEP).").[11]  Plaintiffs' reliance on these provisions to prove that Defendant violated the IDEA by not providing transportation is unavailing.

Furthermore, Plaintiffs did not present any evidence that transportation was a required related service in his IEP, such that Defendant's failure to provide transportation violated B.T.'s IEP.  Additionally, to the extent that Plaintiffs feel that transportation should have been a part of B.T.'s IEP when it was not, other than their subjective opinions, Plaintiffs have not provided any evidence to support this claim.[12]

_____

[11]A district is only required to provide transportation "[w]hen an out-of-district placement for educational reasons is made by a resident district board of education."  N.J.A.C. 6A:27-5.1(a)(2).

[12]The Court notes that Plaintiffs' witnesses testified to the following: (1) The parents testified to communications with the District regarding the need for transportation to the summer program; (2) Lorraine Saari, the parent advocate, testified about meetings with the school including discussions about transportation; and (3) a complaint investigator with the New Jersey Department of Education testified to investigations into other parents' complaints with the district.  None of this

Based on the evidence presented at trial and the law governing ESY programs, transportation, and the IDEA, the Court finds that judgment must be entered in favor of Defendant on Counts Two and Three of Plaintiffs' Complaint.

2.   **Defendant's failure to provide seventeen days of education in September 2003**

Plaintiffs claim that Defendant's failure to provide B.T. with seventeen days of education in September 2003 violates the Rehabilitation Act and the IDEA (Count One).  The Court finds that Plaintiffs have met their burden of proof on both claims.

a.   *Rehabilitation Act claim*

In the Court's prior written Opinion, the Court addressed the issue of what type of conduct by Defendant is required to prove a Rehabilitation Act claim.  The Court analyzed the issue based on Third Circuit precedent, and held that even though the cases did not expressly state that intentional conduct is necessary to maintain a Rehabilitation Act claim, the very nature of a such a claim demonstrates that some sort of intentional, as opposed to merely negligent, conduct is necessary.  (June 10, 2007 Op. at 13.)  The Court explained,

> First, the fourth element of a Rehabilitation Act
> claim suggests intentional conduct.  The fourth element

---

evidence, however, supports Plaintiffs' claims that Defendant violated the IDEA with regard to transportation.

requires that plaintiff prove "he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." The terms "excluded," "denied," and "subject to discrimination" all connote purposeful conduct on behalf of the school district. Second, the language of section 504 of the Rehabilitation Act suggests that more than negligence is required.  Section 504 of the Rehabilitation Act states, in relevant part: No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .. . . 29 U.S.C. § 794(a).  The Third Circuit, in a non-educational-environment case, stated that the meaning of the causation requirement embodied in the phrase "solely by reason of" an individual's disability language was "designed to weed out section 504 claims where an employer can point to conduct or circumstances that are causally unrelated to the plaintiff's handicap."  Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 124 (3d Cir. 1998) (citation omitted).  This also suggests that more than mere negligence is necessary to maintain a Rehabilitation Act claim.

(Op. at 13-14.)

The Court found that because it appeared uncontested that B.T. is disabled, he is otherwise qualified to participate in school activities, and Defendant receives federal financial assistance, the dispositive issue to determining Plaintiffs' Rehabilitation Act claim was whether B.T. was discriminated against--that is, whether B.T.'s right to a free appropriate education was violated--when he missed seventeen days of school in September 2003.  (Op. at 14.)

In Douris v. Bucks County Office of the District Attorney,

13

2004 WL 1529169, *5 (E.D. Pa. July 6, 2004), aff'd 174 Fed. Appx.
691 (3d Cir. 2006), the court explained that in the context of
the ADA, "[w]hile the Third Circuit has yet to address the issue,
all of the other circuits considering the issue have held that
compensatory damages under Title II of the ADA are unavailable
absent as showing of intentional discrimination," citing Ferguson
v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998), Wood v.
President and Trs. of Spring Hill College, 978 F.2d 1214 (11th
Cir. 1992), and Carter v. Orleans Parish Pub. Schs., 725 F.2d 261
(5th Cir. 1984).  Thus, because the protections afforded by Title
II of the ADA and the Rehabilitation Act are substantially
similar and, as a result, are collapsed into a single inquiry,
see Doe v. County of Centiela, 242 F.3d 437, 446-47 (3d Cir.
2001), in order to obtain compensatory damages for a Title II or
Rehabilitation Act violation, a plaintiff must demonstrate
intentional discrimination.  Dorsett v. Southeastern Pennsylvania
Transp. Authority, 2005 WL 2077252, *5 (E.D. Pa. Aug. 29, 2005)
(citing the same cases at the Douris court); McCree v.
Southeastern Pennsylvania Transp. Authority,  2009 WL 166660, *11
(E.D. Pa. Jan. 22, 2009).

     As noted in the Court's August 10, 2007 Opinion, other
circuit courts agree that compensatory damages are recoverable
for Rehabilitation Act claims only upon a showing of intentional
discrimination.  (Op. at 7, n.1, citing Saltzman v. Board of

<u>Com'rs of North Broward Hosp. Dist.</u>, 239 Fed. Appx. 484, 487
(11th Cir. 2007) (citing <u>Wood v. President & Trs. of Spring Hill</u>
<u>College</u>, 978 F.2d 1214, 1219 (11th Cir. 1992)); <u>Daniel v. Levin</u>,
172 Fed. Appx. 147, 149-150 (9th Cir. 2006) (citing <u>Ferguson v.</u>
<u>City of Phoenix</u>, 157 F.3d 668, 674 (9th Cir. 1998)); <u>Monahan v.</u>
<u>Nebraska</u>, 687 F.2d 1164, 1170 (8th Cir. 1982).)

It is therefore clear that in order to prove a violation of
the Rehabilitation Act, Plaintiffs are required to show that
Defendant acted intentionally, rather than negligently, to cause
B.T. to miss 17 days of school in September 2003.  The question
then becomes, however, what degree of intentional conduct is
necessary?  Of all the courts that have considered the issue, the
minimum degree that has been applied has been "deliberate
indifference."  <u>See</u> <u>Saltzman</u>, 239 Fed. Appx. at 487 (stating that
even though it has not yet been determined whether "intentional
discrimination" should be evaluated under the "deliberate
indifference" standard, or under a more stringent standard, such
as "discriminatory animus," because the Plaintiffs had not shown
intentional discrimination under the "lenient deliberate
indifference" standard, summary judgment should have been entered
against them); <u>M.P. ex rel. K. v. Independent School Dist. No.</u>
<u>721</u>, 326 F.3d 975, 982 (8th Cir. 2003) (quoting <u>Monahan</u>, 687 F.2d
at 1171) (holding that the plaintiff "must make a showing of
'either bad faith or gross misjudgment ... before a [Section] 504

15

violation can be made out.'"); Lovell v. Chandler, 303 F.3d 1039, 1056 (9th Cir. 2002) (noting that the deliberate indifference standard applies to discriminatory intent showing under the Rehabilitation Act); Sellers v. School Bd. of City of Mannassas, Va., 141 F.3d 524, 529 (4th Cir. 1998) (agreeing with those courts that hold "that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children").

In the Third Circuit, deliberate indifference has been defined in the Eighth Amendment context with regard to prisoners' claims of deliberate indifference to a serious medical need.  In that context, deliberate indifference has been defined as more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference, and "mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990); see also Andrews v. Camden County, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment."  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)

16

(internal quotation and citation omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

Here, applying this standard in the education context, Plaintiffs have proven that B.T.'s absence from school for 17 days in the beginning of the school year was the result of Defendant's reckless disregard to B.T.'s educational needs.  As early as April 2003, Defendant was aware that B.T.'s mother had a serious health issue and that transporting B.T. to the Access School was problematic.[13]  On April 29, 2003, B.T.'s mother wrote a letter to Phyllis Trobman, Director of Special Services, informing the district about her issues and requesting transportation.  The letter stated that they would no longer be able to transport their son to Access in the upcoming school year.  She also spoke with Trobman in June 2003, on July 7, 2003, and August 18, 2003 regarding her medical condition and inability to drive B.T. to Access.  B.T.'s mother testified that her conversation with Trobman at the end of August was a "last-ditch"

---

[13]Another reason why Plaintiffs could not transport B.T. to Access was B.T.'s father's military obligations and work commitment as an airline pilot.  From March through June, friends and other family members took turns driving B.T. to and from Access.

plea to ask for transportation to Access.  B.T.'s father also
spoke with the school board's attorney to request transportation
because of his wife's serious medical condition, and that request
was denied.

In addition to Plaintiffs' own requests for transportation,
on May 13, 2003, Plaintiffs' former attorney wrote to the school
to request transportation.  In June 2003, Plaintiffs' parent
advocate, Lorraine Saari, also spoke to school district employees
about Plaintiffs' concerns regarding B.T.'s ability to continue
at the Access school due to transportation issues.  She followed-
up with a letter in July, but received no response.

Then, on September 8, 2003, Saari testified that she
contacted Trobman by telephone to reiterate that Plaintiffs could
no longer transport B.T. to the Access school, and inform them
that the parents wished to have B.T. enrolled in the John Hydock
Elementary School in Mansfield.  She followed-up this
conversation with a letter.

Saari testified that Trobman then agreed to hold a meeting
on September 10, 2003 to discuss this change of placement.  On
September 10, 2003, the parties met to discuss B.T.'s placement
and educational program within the school district's own
elementary schools, because of Plaintiffs' inability to transport
B.T. to the Access school.  The next day, B.T.'s father appeared

18

in person at the school with B.T. in order to enroll him.  They waited forty minutes to speak with Trobman and the school's principal, but when they finally met with B.T. and his father, Trobman and the principal refused to enroll B.T.  They left the school property when B.T.'s father noticed police were at the school.

On September 12, 2003, Saari received a letter from Trobman which stated,

> [B.T.'s] reports are not from a psychiatrist.  I am feeling truly abused and have hit a <u>dead end</u>.  They are being referred to as Psychiatrists.  I need to know who is monitoring [B.T.'s] medication.

> I am trying to place [B.T.] into a class at the Mansfield Township Elementary School with his own teacher.  Until parents agree, an at home program is required for [B.T.].

> Parents have withdrawn [B.T.] from Access School at ESU.

> At home instruction to begin Tuesday, September 16th, two hours per day from 3:35 - 5:35 P.M.

B.T. received home instruction for six hours over three days, and these services were inappropriate for B.T.  B.T. ultimately returned to the Access School on November 17, 2003.

Based on the foregoing evidence, it is clear that for four months prior to the start of the school year, the school district was aware that if it did not provide B.T. with transportation to

Access, B.T. would not be able to continue his enrollment there.[14]  Indeed, Trobman admits that she knew of B.T.'s mother's condition, Plaintiffs' inability to provide transportation to Access, and their statement that if transportation was not provided, B.T. could no longer attend Access.  Defendant was also aware that if B.T. could not attend Access, the district still had the obligation to provide B.T. with a free appropriate public education, with one possibility being the Hydock school.

Correspondingly, it is also apparent from the record and the testimony and other evidence admitted at trial that despite being aware of the strong possibility that B.T. would be returning to Hydock in September, Defendant did nothing in anticipation of his return.  Having an obligation to provide B.T. with an education, and knowing for months that his current educational placement was untenable, yet waiting until after the start of the school year to even contemplate the development of an educational plan,

---

[14]The Court does not mean to suggest that the school district had an obligation to provide transportation for B.T. to Access. Rather, the district had an obligation to provide B.T. with a free appropriate public education, and knowing that B.T.'s parents could no longer provide transportation to Access, the district was alerted to the need to provide B.T. with an alternative educational placement.  Two of its many choices were to either provide transportation or create a proper program within the district's own schools.  The district did neither until well after the school year started, and only after pressure was applied by B.T.'s parents and advocate.

constitutes reckless disregard of the school district's duty to provide B.T. with a free appropriate education.  Moreover, the fact that the development of his educational plan was not undertaken until after the school year began, and only after the parent advocate contacted Trobman and insisted on a meeting, as well as B.T.'s father's in person appearance, demonstrates that Defendant acted with deliberate indifference to B.T.'s right to his education.[15]

This is not a situation, like other incidents between Plaintiffs and the school district, where Plaintiffs simply had a subjective dissatisfaction with B.T.'s educational plan.  In cases such as that, tort-like liability for educational

---

[15]Another example of reckless behavior by the Defendant highlights Ms. Trobman's and the district's deliberate indifference to the educational needs of B.T. and the consultative and deliberative process that epitomizes the way the IEP process is supposed to work.  Ms. Trobman admitted in her testimony that in June of 2003 she delivered a copy of B.T.'s IEP, not by scheduling a meeting with the parents or through some other secure means of delivery, but by sending a copy of this sensitive and personal document home through B.T.'s minor sister in a paper envelope.  Although it is clear that by this time the relationship between the parents and the school district had materially deteriorated, it is equally clear to this court from her testimony that Ms. Trobman abdicated her responsibility and that of the district to formulate an appropriate educational plan for B.T. and that her callous treatment of this document was symptomatic of her wistful hope that B.T. and his difficulties would simply go away.  By this point, it was clear that the district had ceased to care about B.T. and would only do what it considered the minimum it could get away with, while remaining ever hopeful that when the first day of school arrived, B.T. would find his way to Access and no longer be the day-to-day responsibility of the defendant.

malpractice is inconsistent with the Rehabilitation Act's provision for a free appropriate education.  See Monahan, 687 F.2d at 1170-71 (holding that § 504 of the Rehabilitation Act does not create a general tort liability for educational malpractice, and that "[s]o long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504); Sellers, 141 F.3d at 527 ("The purpose of these procedural mechanisms is to preserve the right to a free appropriate public education, not to provide a forum for tort-like claims of educational malpractice.").

Instead, even though Defendant did not know officially until after the start of the school year that Plaintiffs wanted B.T. to return to Hydock, it appears that Trobman and others in the school district kept their figurative heads in the sand for months hoping that the issues with B.T.'s transportation would be independently resolved.  Avoidance of their duty to provide B.T. with an appropriate education is not "sound professional judgment," and is a violation of the Rehabilitation Act.[16]

---

[16]This is especially evident because of the tumultuous history between Plaintiffs and Defendant.  Plaintiffs testified that by the summer of 2003, Trobman had stopped taking their calls.  Further, neither party disputes that Plaintiffs and the school district had an adversarial relationship during B.T.'s entire time in the district.

Correspondingly, the district's failure to provide B.T. with a free appropriate public education for seventeen days is also a violation of the IDEA.  Under the IDEA, "any aggrieved party may present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6).  The Rehabilitation Act focuses on disability-based discrimination against special needs students, and the IDEA focuses on the appropriateness of the public education afforded special needs students.  (August 7, 2007 Opinion at 5, citing Hornstine v. Township of Moorestown, 263 F. Supp. 2d 887, 901 (D.N.J. 2003) (citations omitted)).  Thus, while the Rehabilitation Act provides relief from discrimination, the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination. Id.

It is clear, based on the above-described evidence, that Defendant provided B.T. with an inappropriate educational placement in September 2003 by essentially providing no education at all.  Consequently, the Court finds that Defendant also violated B.T.'s IDEA right to a free appropriate public education.

**b.   What damages Plaintiffs are entitled to for Defendant's violation of B.T.'s IDEA and Rehabilitation Act rights**

23

Having found that Defendant is liable for violating B.T.'s rights under the Rehabilitation Act and IDEA for the seventeen days of lost education in September 2003, it must be determined what damages Plaintiffs are entitled to.  The Rehabilitation Act and the IDEA provide for different damage awards.  Under the Rehabilitation Act, a prevailing party is entitled to monetary damages.[17]  See A.W. v. Jersey City Public Schools, 486 F.3d 791, 804 (3d Cir. 2007) ("The remedies for violation of Section 504 are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964. These remedies include compensatory damages, injunctive relief, and other forms of relief traditionally available in suits for breach of contract." (citations omitted)); W.B. v. Matula, 67 F.3d 484, 494 (3d Cir. 1995) (overruled on other grounds) (quoting Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 66 (1992) ("'[P]laintiffs may seek monetary damages directly under § 504,' based on the general presumption that all appropriate remedies are available 'unless Congress has expressly indicated otherwise.'"); see also Neena S. ex rel. Robert S. v. School Dist. of Philadelphia, 2008 WL 5273546, *15 (E.D. Pa. Dec. 19, 2008) (continuing to treat Matula's holding regarding the availability of compensatory damages under the Rehabilitation Act

---

[17]Punitive damages are not available under § 504 of the Rehabilitation Act.  Barnes v. Gorman, 536 U.S. 181, 189 (2002).

as authoritative).

In contrast, compensatory education, rather than monetary damages, is the favored remedy for IDEA violations. The IDEA provides that in a civil action the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Third Circuit has not spoken as to what constitutes "appropriate" relief under the IDEA. See Bucks County Dep't of Mental Health/Mental Retardation v. Pa., 379 F.3d 61, 68 n.5 (3d Cir. 2004) ("We have not settled whether damages are recoverable in an action arising solely under IDEA."). However, all the district courts within this Circuit to have addressed this issue, as well as the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Circuits, have concluded that only compensatory education, rather than compensatory money damages, is the "appropriate" relief under the IDEA. See Neena S., 2008 WL 5273546 at *14 (citing cases); see also D.G. v. Somerset Hills School Dist., 559 F. Supp. 2d 484, 495 (D.N.J. 2008) (agreeing with "the reasoning employed by these district courts and the majority of circuits to consider this issue," "that because monetary damages are 'fundamentally inconsistent' with the goals of the IDEA, they are not an 'available' remedy under the IDEA").

Both the Rehabilitation Act and the IDEA provide for the award of attorney's fees and costs to the prevailing party. See

29 U.S.C. § 794a(b); 20 U.S.C. § 1415(i)(3)(B)(I).

Here, Plaintiffs are entitled to damages for Defendant's violation of the Rehabilitation Act and IDEA for the seventeen missed school days.  Even though Plaintiffs are entitled to money damages for Defendant's Rehabilitation Act violation, the Court finds, however, that based on the evidence presented at trial, Plaintiffs have not proven any monetary damages with regard to the seventeen days B.T. missed of school.[18]  Instead, Plaintiffs are entitled to an award of educational services equal to the services B.T. was denied when Defendant failed to provide him with a FAPE in September 2003.

What constitutes an appropriate award of compensatory education is specific to each case.  As the Court of Appeals for the District of Columbia Circuit has stated, compensatory education is "replacement of educational services the child should have received in the first place" and "compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA."  Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005), cited in Ferren C. v. School Dist. of Philadelphia, --- F. Supp. 2d ----, 2009 WL 222376, *11 (E.D. Pa. Jan. 28,

_____

[18]Plaintiffs testified that they suffered approximately $3,500 in damages for lost wages and transportation costs with regard to transporting B.T. to the summer program.  These damages are unrelated to their seventeen-days-without-school claim.

26

2009).  In this case, as with most IDEA violation cases, the educational services lost cannot simply be returned--that is, seventeen days of fifth grade classes at John Hydock Elementary in Mansfield, New Jersey are of no benefit to a high school student in Tennessee.  Thus, the Court's obligation is to determine the value of that missed schooling, and fashion an appropriate remedy which would benefit B.T. now.

As recently noted in Ferren, the "task is to weigh the interests on both sides and determine the equitable outcome.  This is not an easy task, as we must balance the interests of finality, efficiency, and use of the School District's resources with the compelling needs of [the student] and [his] family."  Ferren, 2009 WL 222387 at *11.  In order to craft the appropriate remedy, the Court requests that the parties submit a remedial plan--either jointly or independently--within thirty days of the entry of this Opinion.  A hearing as to damages will be scheduled, if needed, soon thereafter, and final judgment will then be entered.  Plaintiffs shall also submit a certification of their attorney's fees and costs associated with the prosecution of this matter.

## III. CONCLUSION

For the reasons expressed above, the Court finds that judgment shall be entered in favor of Defendant on Counts Two and Three of Plaintiffs' Complaint, and judgment as to liability

shall be entered in favor of Plaintiffs on Count One.  A judgment as to damages for Count One will be entered following the parties' submission of a remedial plan, the submission of Plaintiffs' certification of counsel fees and costs, and a hearing, if necessary.

An appropriate Order will be entered.


Date: <u>March 17, 2009</u>                    <u>s/ Noel L. Hillman      </u>

At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.